Fred SMITH, Appellant,

v.

Vinson THOMPSON, Warden, Appellee.

Vinson THOMPSON, Warden, and Tennessee Department of Correction, Appellants,

v.

Joseph W. McKENNA, Appellee.

Vinson THOMPSON, Warden, Jim Dickman, Warden, and Lamar Alexander, Governor, Appellants,

v.

Roland HARRIS, Jr., Appellee.

Court of Criminal Appeals of Tennessee.

April 10, 1979.

Certiorari Denied by Supreme Court
May 29, 1979.

David M. Pack, James W. Price, Jr., Nashville, for appellant in No. 532.

Thomas Wardlaw Steele, Nashville, for amicus curiae, John J. Hooker, Jr.

Edward M. Yarbrough, Nashville, for appellee in No. 534.

Thomas H. Shriver, Dist. Atty. Gen., William M. Leech, Jr., Atty. Gen., C. Hayes Cooney, Chief Deputy Atty. Gen., Robert A. Grunow, Senior Asst. Atty. Gen., Nashville, for appellants.

Lionel R. Barrett, Jr., William P. Redick, Jr., Nashville, for appellee in No. 536.

## OPINION

WILLIAM S. RUSSELL, Presiding Judge.

These three consolidated cases each present the question of the legal effect of sentence commutations signed by then Governor Ray Blanton two days before he left office. Each of the convicts involved in these three cases sought release from the penitentiary by prosecuting petitions for the writ of habeas corpus. After full hearings, McKenna and Harris were granted the writ and Smith was denied it.

The position of the State is that former Governor Blanton had the power and authority to issue the commutations, but that they were never delivered prior to their recall by Governor Alexander and the State insists that delivery is essential to their effectiveness.

The position of McKenna, Harris and Smith is that the delivery of a granted commutation is not essential to its operation; but if delivery is essential, then these commutations were in fact delivered.

The position of the *Amicus Curiae* is that former Governor Blanton lacked the authority to issue these commutations, because they were not first recommended by the Board of Pardons and Paroles, per T.C.A. § 40–3504.

We shall summarize the pertinent facts, based upon undisputed testimony, stipulations and judicial notice.

On the evening of January 15, 1979, then Governor Blanton signed a large number of commutations. The three involved in this litigation had these things in common: all three were penitentiary prisoners who had apparently at one time been assigned to work duties at the Governor's mansion; in each case their sentences were commuted to "time served"; and none of them had been recommended for a commutation by the Board of Pardons and Paroles. (All apparently soon knew of the then Governor's action in their respective cases and they each desired the commutations. Furthermore, there is no indication that former Governor Blanton has ever desired to rescind any of the commutations.)

After the commutations were signed by Governor Blanton they were acknowledged by the signature of the Secretary of State. All of the commutations which were executed at that time were forwarded (the exact procedure does not appear) from the office of the Governor's legal counsel (Judge Robert Lillard) to the office and person of Mr. Murrell Pitts, Director of the Records Division of the Department of Corrections, whose job it was to credit the sentences with the commutations and process the releases of those to be released. (It

was he who would write the Warden and order the releases.) It appears that several of the commutations were processed and the convicts released immediately. It further appears that then Commissioner of Corrections C. Murray Henderson telephoned Mr. Pitts, apparently on the morning of January 17, and instructed him to "slow walk" the commutations involving the convicts who were assigned to work details at the Governor's mansion. Apparently Mr. Pitts received the commutations on the morning of January 17, 1979, prior to the telephone call from the Commissioner. (What motivated the Commissioner to issue his "slow walk" instruction does not appear, and the record before us would better lend itself to a decision of the issues involved if Commissioner Henderson's motives were explained. This is true because at that time Governor Blanton was still in office, and the Commissioner would normally be expected to be carrying out the Governor's wishes. However, in total context, we must logically and do assume that in this instance Governor Blanton had no knowledge of the Commissioner's action.)

The attorney for at least one of these convicts (Mr. Yarbrough for McKenna) telephoned Mr. Pitts on January 17, urging the processing of that commutation. Mr. Pitts, however, did not process any more on January 17th, because of Commissioner Henderson's telephoned instruction. At approximately 6:00 P.M. on January 17th Governor elect Lamar Alexander was administered the oath of office, three days before his scheduled inauguration. At approximately 8:00 P.M. that evening Mr. Pitts received a telephone call at his residence from Hon. William Koch, a Deputy Attorney General who was at that time acting as legal counsel to Governor Alexander, and Koch advised Pitts that he had contacted Commissioner Henderson and had been advised to transmit his (Koch's) message to Mr. Pitts. The message was that Mr. Pitts was not to process any more commutations that were in his office or that were received subsequently from any other source (other than the new Governor). Koch advised Pitts that Corrections was not to permit any additional inmates to be processed out of the prisons due to the commutations, even though the commutations were at the respective prisons (which reflected an indifference to any further delivery of the commutations to the Warden or anyone else, and hinged the order upon only the fact of an actual prior release); and Mr. Pitts was further instructed that no records in Pitts' possession were to be turned over to the office of the legal counsel for former Governor Blanton. General Koch represented to Mr. Pitts that he was speaking for Governor Alexander, and that he would be issued further instructions on the following day. Apparently at some later time the commutations involved in these cases were sent by Corrections to the office of Governor Alexander. It is not clear if the originals are lodged with the Secretary of State, although there was some testimony to that effect. There is also testimony that they were returned to Judge Thomas Hull, Governor Alexander's legal counsel.

This record does not reflect Governor Alexander's motive in the premises. Nor is there any evidence of illegality, fraud or improper motivation in the issuance by former Governor Blanton of the commutations. We decide these cases upon the record, giving, as we are bound to do, full faith and credit to former Governor Blanton's official acts while he was Governor, in the absence of any showing of any illegality therein; but with complete confidence that Governor Alexander acted in good faith.

As we noted at the beginning, the State concedes that Governor Blanton had the power to issue the commutations, and defends solely upon the proposition that delivery was never legally accomplished.

Much of what has been addressed in the briefs is unnecessary to the decision of these cases. We resist the temptation to "restate the law of commutations", because it is generally the better practice for appellate courts to confine decisions to the questions before us.

■ We accept the thesis of the State that delivery is necessary to the validity of

a commutation if by delivery it is meant that it must clearly appear from his actions in the matter that the Governor who issued the commutation must intend that it become and be immediately effective and that the Governor never does or says anything inconsistent with that intention. It would be a disservice to hold that ritualistic acts by subordinate officials were a necessary condition precedent to the validity of an intended act of pardon by the Chief Executive of the State. These commutations end with this language:

NOW, THEREFORE, I, Ray Blanton, Governor, by virtue of the power and authority in me vested, do hereby commute the said _____ from the offense of _____ to _____ and the sentence from _____ to *time served* but in no other way interfering with the judgment and sentence of said Court; and I further authorize and direct that the authority having the said _____ in custody, will act accordingly.

"IN TESTIMONY, WHEREOF, I
have hereinto set my hand
and caused the Great Seal
of the State to be affixed
at Nashville, Tennessee, on
the 15th day of January 1979.
(s) Ray Blanton
    Governor
By the Governor:
(s) Gentry Crowell
    Secretary of State"

It is clear from these consolidated records that after Governor Blanton signed these commutations that his signature was attested by the Secretary of State, and that Governor Blanton's agent in the matter (his legal counsel, Judge Robert Lillard) transmitted the commutations to the appropriate State official (Mr. Pitts) to carry them out. As a matter of fact, many of those issued at the same time were processed and the prisoners released. These three were not processed to a conclusion, not because of any lack of will or intention on the part of then Governor Blanton, or absence of his power and authority to grant them, but because Commissioner Henderson deliberately de-layed them, at a time when Governor Blanton was still in office.

■ Argument is made that delivery of a commutation must be made to the warden before it is effective. We reject this rigid view, for both practical and legal reasons. Persons sentenced to the penitentiary in this State are, in practical effect, sentenced to the custody of the Department of Corrections. See T.C.A. §§ 41–101, 37–237, 41–201, 41–102, 41–326, etc. That department classifies them, moves them from facility to facility at will, and may even leave them in a county jail somewhere. See T.C.A. §§ 41–205, 44–1143. The Department of Corrections can and does take convicts from the custody of one warden and transfer them to the keeping of another as a regular practice. The time that every convict in the State must serve is calculated and kept in the office presently occupied by Mr. Pitts, known as Central Records. The various wardens are simply agents of the Department of Corrections, under the supervision of the Commissioner. It would be hyper-technical to the point of absurdity to hold that after the sentences of these convicts, as kept by Mr. Pitts for Corrections in Central Records, were changed to reflect that their sentences had been commuted to time served, (as it was Mr. Pitts' duty to do when the Governor sent the commutations to him) that the prisoners had no right to immediate release only because the warden had not seen the commutations or because the prisoners had not received copies. As a matter of fact, the warden is a party to these three cases, and copies of the commutations are of record herein, so he now has in-court knowledge of former Governor Blanton's actions. If "delivery" to the warden had been held by us to be a necessity, he has now had delivery, per the records and stipulations of this lawsuit. While T.C.A. § 41–204 does in fact require each warden to keep a book on sentences pronounced as to each of the prisoners in his charge, it is clear from Mr. Pitts' testimony that that information flows from Central Records and had he not been stopped he would have written the warden advising

him of the changed sentences, and ordering the immediate release of these men.

The distinguished Attorney General took the position during oral argument that the present Governor, His Excellency, Lamar Alexander, could rescind the action of former Governor Blanton in the premises. This argument, to be valid, must presume that whatever "delivery" was required to finalize the commutations had not taken place. Certainly Governor Alexander could not rescind an action of the former Governor if it had already passed the point of recission by the Governor who took the action. We hold that the actions of former Governor Blanton in reducing the sentences in these cases to time served was a valid and binding act, made so by his signing the commutations, having that act attested to by the Secretary of State, and then having them delivered to the records divisions of the Department of Corrections for the purpose of processing. The actions and inactions of subordinate officials, acting independently of the Governor and contrary to his obvious wishes, cannot be held to negate these commutations.

We affirm the granting of the writ of habeas corpus to McKenna and Harris; and reverse the denial of the writ to Smith, remanding his case for the granting of the writ.

■ We wish to express our appreciation to Hon. John J. Hooker, Jr., *Amicus Curiae*, and his excellent counsel, Hon. Thomas Wardlaw Steele, for their work on behalf of the Court. It is their position, buttressed by a scholarly brief, that the power of the Governor to commute sentences is statutory only, and that it presently is bottomed solely upon the provisions of T.C.A. §§ 40–3501 and 40–3504. The *Amicus* candidly admits that his position is contrary to the recent holdings of our Supreme Court in *Bowen v. State*, Tenn., 488 S.W.2d 373 (1972), and *Collins v. State*, Tenn., 550 S.W.2d 643 (1977), and asks that we overrule those cases. Under *Bowen* and *Collins*, former Governor Blanton clearly had the power to commute these sentences, without any prior recommendation by the Board of Pardons

and Paroles, contrary to the argument of the *Amicus*. We believe that it is preferable to say, as our Supreme Court has, that the Governor has the constitutional power to commute rather than to say that the only such existing power has been, in effect, given exclusively to the Board of Pardons and Paroles (with the Governor having only the power to in effect veto the Board's recommendations).

Affirmed as to McKenna and Harris; reversed and remanded as to Smith.

O'BRIEN, J., and JERRY SCOTT, Special Judge, concur.

O'BRIEN, Judge, concurring.

I fully concur with the lead opinion in these cases. I feel it essential to add, finding as we do, "the actions of former Governor Blanton in reducing the sentences in these cases to time served was a valid and binding act," that neither he nor incoming Governor Alexander could rescind or revoke the commutations and conditional release of these prisoners by utilization of any procedure short of a due process hearing as set out in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1974); and *Fleenor v. Hammond*, 116 F.2d 982 (C.A.6 1941).