Herbert TATE, Plaintiff,

v.

Lamar ALEXANDER, et al., Defendants.

Melvin ALEXANDER, Plaintiff,

v.

Lamar ALEXANDER, et al., Defendants.

Nos. 79–3031, 79–3308.

United States District Court,
M. D. Tennessee,
Nashville Division.

Nov. 30, 1981.

Larry D. Woods and Christine Entis, Nashville, Tenn., for plaintiffs Tate and Alexander.

Robert R. Campbell, Knoxville, Tenn., for defendant Alexander.

Linda R. Butts, Senior Asst. Atty. Gen., Robert B. Littleton, Sp. Deputy Atty. Gen., Nashville, Tenn., for defendants Bradley and Dickman.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiffs, two former inmates at the Correctional Rehabilitation Center, a state prison located at Nashville, Tennessee, bring this action under 42 U.S.C. §§ 1983 and 1985 alleging that defendants Lamar Alexander (Governor of Tennessee), Harold Bradley (Commissioner of the Tennessee Department of Correction), and James Dickman (Superintendent of the Correctional Rehabilitation Center) individually and collectively violated plaintiffs' constitutional right to liberty by keeping plaintiffs imprisoned for several months after their sentences had been commuted by former governor Ray Blanton. Defendants counter

this allegation by arguing (1) that no constitutional right of plaintiffs was violated by their continued imprisonment, and alternatively, (2) that even if plaintiffs' constitutional rights were violated, defendants are entitled to a qualified immunity for their actions that precludes a finding of liability in this case. Defendants also argue with regard specifically to plaintiffs' section 1985 claim that (1) no conspiracy in fact existed among the defendants and (2) even if a conspiracy is found factually to have existed, it is not recognized legally because, as defendants are all members of a single executive department, the "intracorporate conspiracy" doctrine prevents a finding of conspiracy here.

All parties have moved for summary judgment in this case pursuant to Rule 56, F.R.Civ.P. Having determined that no genuine issue exists regarding any material fact, this Court makes the following conclusions of law: (1) that neither defendant Commissioner Harold Bradley nor defendant Superintendent James Dickman can be said to have violated plaintiffs' constitutional rights by their actions; (2) that defendant Governor Lamar Alexander is entitled to qualified immunity for his actions and is therefore not liable under 42 U.S.C. § 1983; and (3) that no conspiracy in violation of 42 U.S.C. § 1985 existed. Because of its determinations regarding the role of defendants Bradley and Dickman and Governor Alexander's entitlement to immunity, this Court makes no ruling concerning whether plaintiffs' constitutional rights actually were violated.

## I. Facts

This case grows out of a bizarre episode in Tennessee history. The facts giving rise to plaintiffs' claim are essentially those that precipitated the effective ouster of one governor of this state and the installation of his successor.

On the evening of January 15, 1979, Ray Blanton, then Governor of Tennessee, prop-erly signed and caused to be sealed by the Secretary of State of Tennessee documents commuting the prison sentences of plaintiffs Herbert Tate and Melvin Alexander, who were both at that time imprisoned at the state Correctional Rehabilitation Center [CRC] located at Nashville, Tennessee. Plaintiffs were part of a group of fifty-two (52) inmates imprisoned at various facilities throughout the state who received some form of executive clemency from Governor Blanton on that date.[1] The sentences of both plaintiffs Tate and Alexander were commuted to "time served" by Governor Blanton. The commutation papers, having been properly signed and sealed, were delivered to the Director of the Records Division of the Department of Correction, who was to process the releases.

After the papers were delivered to the Department of Correction, but before plaintiffs' commutations were processed and plaintiffs physically released from confinement, several events, which form the basis for this lawsuit, occurred. On the afternoon of January 17, 1979, then Governor-elect Lamar Alexander was informed by Mr. Hal Hardin, then the United States Attorney in Nashville, that Governor Blanton was intending to grant releases to several inmates who were the targets of a federal grand jury investigation into payoffs by prisoners in exchange for clemency from the governor's office.[2] Governor-elect Alexander was further informed that several of the inmates for whom commutation papers had been signed on January 15 were also targets of the investigation. No names of specific inmates were ever mentioned by Mr. Hardin, however, and Governor Alexander never received information from the United States Attorney's Office implicating any individual prisoners, including plaintiffs.

As a result of Mr. Hardin's message on January 17, the decision was made by Governor-elect Alexander, the Lieutenant Gov-

---

1. Three of the fifty-two inmates were granted full pardons and twenty-eight of the remaining forty-nine received commutations reducing their sentences to time served.

2. Previously, in December 1978, federal charges had been filed against several of Governor Blanton's top aides for their alleged participation in a clemency-for-cash scheme.

ernor of Tennessee, and the Speaker of the Tennessee House of Representatives that Alexander would be sworn in on that evening, several days in advance of the scheduled inauguration date. Accordingly, at 6 p.m. on January 17, 1979, Lamar Alexander was administered the oath of office of Governor and became the Governor of Tennessee.

Immediately after his swearing-in, Governor Alexander, acting on the advice of Tennessee Attorney General William Leech, issued a "freeze on the prison doors" and ordered that none of the prisoners who had been granted pardons or commutations on January 15 by Governor Blanton be released. In order to effectuate this "freeze," instructions were relayed on the evening of January 17 to Mr. C. Murray Henderson, then Commissioner of the Department of Correction, to assemble and hold all pardon and commutation documents that had been signed by Governor Blanton on January 15 and to account for copies of those documents. Also on the evening of January 17, Mr. William Koch, then with the office of the Attorney General and acting on behalf of Governor Alexander, instructed Mr. Murrell Pitts, Director of the Records Division of the Department of Correction, to assemble all of the documents that had been signed by Governor Blanton and to prevent any further delivery of them. Mr. Koch also instructed Mr. Pitts that he was neither to process any more of the documents nor to permit the release of any inmates pursuant to the documents.[3] As a result of the orders from Governor Alexander, plaintiffs Tate and Alexander were not released from the CRC.

Subsequent to Governor Alexander's actions and orders not to release any inmates who had been granted commutations by Governor Blanton on January 15, several of those inmates filed suit in state court, as well as petitions for writs of habeas corpus.

On April 10, 1979, the Tennessee Court of Criminal Appeals ruled that the commutations granted by Governor Blanton on January 15 were valid and could not be rescinded by Governor Alexander.[4] Governor Alexander argued that the commutations were not valid since they had not been delivered to the prisoners themselves. The Court of Criminal Appeals rejected this argument, declaring that the commutations were valid upon delivery to the Department of Correction. The Court of Criminal Appeals consequently granted the prisoners' petitions for writs of habeas corpus. The State petitioned the Tennessee Supreme Court for review of the Court of Criminal Appeals' decision, but the Supreme Court denied certiorari in the case on May 29, 1979.

Throughout the events just described, plaintiffs Tate and Alexander remained incarcerated at the CRC in Nashville. Plaintiff Tate was not released until April 19, 1979, following his petition for a writ of habeas corpus in state court. Plaintiff Alexander was not released until after the Tennessee Supreme Court's denial of certiorari on May 29.

Also throughout the events just described, defendant James Dickman served as superintendent of the Correctional Rehabilitation Center at Nashville. Defendant Dickman was in no way involved in the decision by defendant Governor Alexander to prevent plaintiffs' release from the CRC, and defendant Dickman was not notified by any official within the Department of Correction that commutations had been issued for plaintiffs. Defendant Dickman took no steps to secure plaintiffs' release from the CRC.

Defendant Harold Bradley was appointed Deputy Commissioner of the Department of Correction on January 17, 1979, and was later sworn in as Commissioner of that De-

---

3. Sixteen of the fifty-two inmates granted clemency by Governor Blanton had already been released from prison by January 17, 1979.

4. *Smith v. Thompson*, 584 S.W.2d 253 (Tenn. Ct. Crim. App. 1979), *cert. denied*, May 29, 1979. The Court of Criminal Appeals' ruling

actually was directed at three cases that were consolidated before the court. In two of these cases, the lower court had declared the commutations to be valid; the third court had ruled them invalid.

partment on March 7, 1979. Like defendant Dickman, defendant Bradley took no part in the decision to "freeze" the state prison doors. Also, like defendant Dickman, defendant Bradley took no steps to release plaintiffs from the CRC. Defendant Governor Alexander had informed defendant Bradley that he reserved all decisions regarding matters of executive clemency for himself, and defendant Bradley acquiesced in the Governor's decision.

## II. *Plaintiffs' Section 1983 Claim*

### A. *The Causation Requirement*

At the outset, this Court must consider the issue of causation as a precondition to liability under section 1983. Defendants Bradley and Dickman argue that they cannot be held liable under that section because they played no real part in the events that resulted in the alleged violation of plaintiffs' constitutional rights. Essentially, defendants Bradley and Dickman argue that no sufficient causal nexus exists between their actions and plaintiffs' alleged deprivation of rights. This Court agrees.

■ By its terms 42 U.S.C. § 1983 imposes civil liability upon any individual

> who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . . .

Plaintiffs argue that their constitutionally protected fourteenth amendment right to liberty was violated by their continued incarceration after former Governor Blanton had commuted their sentences and that all three defendants are responsible for that violation. Apparent from the language of section 1983, however, is the condition that liability will be imposed only upon those individuals who "subject" or "cause to be subjected" another to a deprivation of constitutional rights. For this Court to find defendants liable under section 1983, then, it obviously must determine whether defendants violated or caused to be violated plaintiffs' right to liberty. That determination is itself dependent on whether defendants actually can be held responsible for the acts that plaintiffs claim violated their constitutional rights. This is the essence of section 1983's causation requirement. Before a government official can be held liable under section 1983 for violating an individual's constitutional rights, it must first be shown that the official was legally responsible for the allegedly unconstitutional act itself. If it cannot be said that the official was responsible for the act, then clearly no liability will attach, regardless of whether another's constitutional rights were violated by that act. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

■ As noted, the gravamen of plaintiffs' claim is that their continued incarceration after the issuance of the January 15, 1979, commutations by Governor Blanton violated their constitutional right to liberty as protected by the fourteenth amendment. Plaintiffs charge that defendants—individually and collectively—violated plaintiffs' rights. Plaintiffs argue that Governor Alexander should be found responsible because it was upon his orders that plaintiffs were not released from their incarceration. Plaintiffs contend that Commissioner Bradley and Superintendent Dickman should also be held responsible because each failed to take steps to seek plaintiffs' release despite Governor Alexander's directive. This Court agrees with plaintiffs that if this Court were to determine that a constitutional violation occurred, Governor Alexander, because of his actions, could be held responsible for that violation.[5] This Court cannot agree, however, that defendants Bradley and Dickman similarly could be held responsible.

---

**5.** This Court, however, does not express an opinion concerning whether plaintiffs' constitutional rights were in fact violated by Governor Alexander. *See* this Court's discussion *infra* of Governor Alexander's entitlement to qualified immunity and the absence of any need for this Court to rule on the constitutional issue.

If plaintiffs were in fact deprived of their constitutional right to liberty, the responsibility of defendant Governor Alexander for that deprivation would be clear. But for Governor Alexander's order to "freeze the prison doors" plaintiffs would have been released from the CRC pursuant to the commutations issued by Governor Blanton on January 15, 1979. The same cannot be said regarding the actions of defendants Bradley and Dickman. Indeed, the role played by Commissioner Bradley and Superintendent Dickman in this affair is conspicuously minute and inconsequential.

Plaintiffs argue that Commissioner Bradley and Superintendent Dickman were responsible for plaintiffs' continued incarceration because they did not attempt to effect plaintiffs' release from prison after Governor Alexander's order. While there is some merit to plaintiffs' contention, this Court does not believe that the actions—or rather, inactions—of defendants Bradley and Dickman can realistically be considered to be of sufficient magnitude to amount potentially to a violation of section 1983.[6] This Court cannot conclude that a sufficient causal nexus existed between these two defendants' conduct and plaintiffs' continued incarceration. Plaintiffs have failed to demonstrate to this Court either that but for the failure of defendants Bradley and Dickman to act plaintiffs would have been released or even that defendants' failure to act was a substantial factor in plaintiffs'

continued imprisonment. *See* W. Prosser, *Law of Torts* §§ 41–42 (4th ed. 1971). Because of Governor Alexander's orders, defendants Bradley and Dickman would have been unable to release plaintiffs even if they had tried to do so. This Court does not believe that liability under section 1983 can be found for the failure of an individual to engage in such futile activity. *Cf. Douthit v. Jones,* 641 F.2d 345 (5th Cir. 1981). Given the absence of any direct responsibility or causal connection between defendants' actions and plaintiffs' continued incarceration, this Court concludes that these defendants did not violate section 1983.[7] *See Naughton v. Bevilacqua,* 605 F.2d 586 (1st Cir. 1979); *Dominguez v. Beame,* 603 F.2d 337 (2d Cir. 1979).

Because plaintiffs have failed to demonstrate the requisite causal connection between the actions of defendants Bradley and Dickman and the allegedly unconstitutional incarceration of plaintiffs, plaintiffs' section 1983 claim against these two defendants is dismissed. As stated above, however, it is clear that the nexus does exist between defendant Governor Alexander's actions and plaintiffs imprisonment beyond January 17, 1979. Consequently, this Court's analysis will now focus on the issue of Governor Alexander's liability—or lack thereof.

B. *Governor Alexander's Entitlement to Qualified Immunity*

■ Defendant Governor Alexander has responded to plaintiffs' claim by raising two

---

**6.** In addition to asserting the causation requirement under section 1983, defendants Bradley and Dickman contend that the essence of this requirement is that a defendant must have taken some affirmative step to deprive a plaintiff of his constitutional rights before a violation of section 1983 can be found. While this Court obviously agrees that a causation element exists, this Court disagrees with these defendants' characterization of it. The language of section 1983—that one who "subjects or causes to be subjected" any person to a deprivation of constitutional rights will be civilly liable—clearly contemplates liability for both activity and inactivity on the part of a defendant. Indeed, a failure to act can as easily result in a violation of section 1983 as deliberate actions. *Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978); *Parker v. McKeithen,* 488 F.2d 553 (5th Cir. 1974); *Whirl v. Kern,* 407 F.2d 781 (5th Cir. 1968), *cert.*

denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). The requirement of causation for liability under section 1983, while existent, is thus not as stringent as defendants Bradley and Dickman contend.

**7.** While this Court does not rule on plaintiffs' constitutional claim, it is important to realize that even if a constitutional violation occurred and defendants Bradley and Dickman could be said to have caused that violation, each defendant would still not be liable under section 1983. Defendants Bradley and Dickman would be entitled to the same qualified immunity for their acts—or nonacts—as that which protects Governor Alexander. *See Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). *See also* this Court's discussion of the qualified immunity defense *infra.*

basic defenses. First, Governor Alexander argues that plaintiffs' were deprived of no constitutionally protected interest by virtue of their continued incarceration. Second, Governor Alexander contends that even if plaintiffs' constitutional rights were violated, he cannot be held liable for that violation because he is entitled to qualified immunity for his actions. This Court accepts Governor Alexander's latter assertion without ruling on the validity of the former. As discussed below, this Court must agree with Governor Alexander's contention that on the facts of this case he is entitled to qualified immunity, even if a constitutional violation occurred, and is therefore not liable under section 1983. In light of that conclusion, it would serve no purpose for this Court to opine on the merits of plaintiffs' constitutional claim. *See Jihaad v. O'Brien*, 645 F.2d 556, 564 (6th Cir. 1981). Governor Alexander is entitled to immunity regardless of whether plaintiffs' rights actually were violated.[8]

By its language, section 1983 does not provide an immunity defense to anyone charged with its violation. Rather, the immunity defense is a judicially created device to shield certain defendants from liability for acts committed in the course of their official duties. The immunity provided for state executive officials, however, is not absolute. It is instead a limited grant of immunity—a qualified immunity—that is applicable only under certain conditions.

In *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court first articulated the concept of qualified immunity for state officials. Although it rejected an absolute immunity for such officials, the Court stated that some degree of immunity must be available because "officials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Id.* at 246, 94 S.Ct. at 1691, 40 L.Ed.2d at 102. Whether this qualified

---

**8.** While declining to rule on its validity, this Court notes that plaintiffs' claim does raise an interesting issue of law. Plaintiffs' claim is essentially analogous to an action for false imprisonment, albeit on a constitutional level. The Supreme Court has stated that section 1983 must be construed against the background of common law tort principles. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1212, 18 L.Ed.2d 288 (1968); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The elements of a common law false imprisonment cause of action are (1) intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm. *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980); *Bryan v. Jones*, 530 F.2d 1210 (5th Cir. 1976); *Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968), *cert. denied*, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969); Restatement (Second) of Torts § 35 (1965). All three elements exist here. Defendant Governor Alexander clearly intended to keep plaintiffs confined; Governor Alexander performed acts that resulted in plaintiffs' continued confinement; and plaintiffs were certainly aware of their extended confinement and the circumstances surrounding it.

Although the elements of a common law false imprisonment action are thus clearly made out, this in itself is not enough to prove that a violation of section 1983 has occurred. Something more is needed to elevate plaintiffs' claim to a constitutional level. As the Supreme Court stated in *Baker v. McCollan*, 443 U.S.

137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433, 443 (1979),

> Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.... Remedy for the latter type of injury must be sought in state court under traditional tort law principles....
>
> [F]alse imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

Plaintiffs argue that the illegal nature of their continued confinement makes their claim one of constitutional dimension. It is true that the April 10, 1979, decision by the Tennessee Court of Criminal Appeals established that each inmate whose sentence had been commuted by former Governor Ray Blanton was being held illegally by the State of Tennessee. Moreover, it is well established not only that an illegal detention by state authorities is unconstitutional, but also that the failure to release a prisoner within a reasonable time after the expiration or termination of his sentence violates the fundamental right to liberty. *See Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980); *Williams v. Anderson*, 599 F.2d 923 (10th Cir. 1979); *Bryan v. Jones*, 530 F.2d 1210 (5th Cir. 1976); *Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968); *cert. denied*, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). *See also Burgess v. Roth*, 387 F.Supp. 1155 (E.D.Pa.1975).

immunity is applicable to a given action depends on the circumstances surrounding that act.

[A] qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.

*Id.* at 247, 94 S.Ct. at 1692, 40 L.Ed.2d at 103. The test set forth by the Court in *Scheuer* for granting qualified immunity to an official for an act is "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief . . . ."

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court explained that the *Scheuer* test contains both objective and subjective elements. Not only must an official believe that his act is proper, his belief itself must also be reasonable. As the Court stated,

The official himself must be acting sincerely and with a belief that he is doing right, but an act violating [an individual's] constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law . . . than by the presence of actual malice.

*Id.* at 321, 95 S.Ct. at 1000, 43 L.Ed.2d at 225. Elaborating on the *Scheuer* test, the *Wood* Court declared that an official will not be immune from section 1983 liability.

if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [individual] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [individual].

*Id.* at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225. This rule does not imply that an official will be liable under section 1983 any time it is subsequently determined by a court that an individual's constitutional rights were violated by the official. The law surrounding the individual's claimed constitutional right must at the time of its deprivation be "settled" and "indisputable." An official will not be "charged with predicting the future course of constitutional law." As the Court stated,

A compensatory award will be appropriate only if the [official] has acted with such an impermissible motivation or with such disregard of [the individual's] *clearly established* constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id.*, at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225 (emphasis added).

■ As set out by the Supreme Court in *Scheuer* and *Wood*, then, the standard for determining the appropriateness of the good faith, qualified immunity defense in any situation consists of two alternative considerations: (1) whether the defendant official acted with malice to deprive the plaintiff of a constitutional right or to otherwise injure the plaintiff, or (2) whether the defendant official knew or reasonably should have known that his actions would violate a clearly established constitutional right of the plaintiff. *See Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). It is clear to this Court from the facts of this case that defendant Governor Alexander did not act with malice or any semblance of bad faith in making his decision to "freeze" the prison doors.[9] Con-

---

9. In evaluating Governor Alexander's actions in this case, it is important to note that the immunity to which he is entitled is only a qualified immunity. As stated earlier, this type of immunity is not absolute, but rather is afforded to an official only when it would be unfair to subject him to liability for good faith actions based on information that later turns out to be incorrect or for good faith actions taken under the press of time. *Sellars v. Procunier*, 641

F.2d 1295 (9th Cir. 1981). This Court believes that such immunity should be granted only when circumstances absolutely demand that it apply. This Court also believes, however, that this case does present such circumstances.

Unlike the decisions of judicial officers, who have been held to be entitled to absolute immunity, the actions of elected public officials are to be given strict review by a court. Occasionally, impermissible considerations and improp-

sequently, this opinion will focus on the second of the *Scheuer-Wood* considerations: whether Governor Alexander knew or reasonably should have known that he was violating a clearly established constitutional right of plaintiffs.

It is important to note at this juncture that plaintiffs bear the burden of proving that Governor Alexander is not entitled to qualified immunity in this case. Procedurally, defendant must establish a prima facie entitlement to qualified immunity by showing that his challenged actions were within the scope of his discretionary authority. The showing that a defendant must make to avail himself of the qualified immunity defense depends upon the degree of discretion that he exercises in the performance of his official duties. As Governor, defendant Alexander exercises the highest degree of discretion in his official acts, and matters involving commutations are clearly within that discretion. Because Governor Alexander was acting properly within the scope of his discretionary authority in ordering the freeze on the prison doors, plaintiffs must prove that he is not entitled to the qualified immunity defense. *See Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir. 1981); *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980). As discussed below, this Court finds that plaintiffs have failed to show that Governor Alexander knew or should have known that he was violating a clearly established constitutional right of plaintiffs. Plaintiffs have thus failed to carry their burden of proof, and Governor Alexander cannot be held liable under section 1983.

Governor Alexander asserts that he did not know that he was violating any of plaintiffs' constitutional rights, and having reviewed the depositions and pleadings submitted in this case, this Court believes that Governor Alexander in fact did not know that his actions would violate a constitutionally protected interest. So far as concerns the subjective component of the second *Scheuer-Wood* consideration, then, Governor Alexander is not liable under section 1983.

Along with the subjective test, however, an objective inquiry must also be made—that is, this Court must determine whether Governor Alexander reasonably should have known that he was violating plaintiffs' clearly established constitutional rights. The key to this determination is whether the particular constitutional right asserted by plaintiffs was so clearly established at

er motives will unduly influence the decisions of elected officials, and it is the role of the courts to safeguard the interests of those individuals whose rights may be transgressed for the sake of political expediency. It is for this reason that only a qualified immunity applies to executive officials. As the Ninth Circuit has related, the qualified immunity doctrine is itself a reflection of the decisionmaking methods employed by executive officials.

Decision making by a public official ... is above all a political process.... We do not expect impartiality; rather we expect that an elected official will balance the demands of his or her constituency in making a decision, and that the decision will to some extent reflect the pressures exerted on the official by those with an interest in the controversy. Political decision-making—unlike judicial decision-making—is not a pristine process that must be protected at all cost from infection by fear of lawsuits.

*Sellars v. Procunier*, 641 F.2d 1295, 1300–01 (9th Cir. 1981). Qualified, rather than absolute, immunity is appropriate in reviewing the actions of elected officials because it "neither imposes an unfair burden upon a person as-suming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214, 225 (1975). Plaintiffs in this case contend in part that Governor Alexander's actions were improper, in bad faith, or done with malice because they may have been politically motivated. Although Governor Alexander denies that political considerations influenced his decision, this Court finds the whole debate on that issue to be meaningless. As the *Sellars* decision indicates, it is expected that politics will play some role in the actions of an elected official, especially the governor of a state. The standard of review under the qualified immunity defense is designed to take that fact of life into account. The question of crucial importance here is thus not whether Governor Alexander's actions were in some way politically motivated, but whether Governor Alexander knew or reasonably should have known that he was violating a clearly established constitutional right of plaintiffs.

the time that Governor Alexander ordered the freeze on the prison doors that he reasonably should have known that he was violating that right. Because the right in question here was not—and in fact, is not—clearly established, this Court finds Governor Alexander not liable under the objective component of the *Scheuer-Wood* test as well.

Some controversy has developed over the years concerning exactly how one can tell that a particular constitutional right has become "clearly established" for purposes of applying qualified immunity for official actions, and unfortunately, the courts have developed no clear standard for resolving this issue. Jurists have struggled with this question since the "clearly established" test was articulated by the Supreme Court in *Wood v. Strickland*, and numerous commentators have noted the uncertainty and ambiguity that is essentially inherent in that test. *See* Casto, *Innovations in the Defense of Official Immunity Under Section 1983*, 47 Tenn.L.Rev. 47, 90–104 (1979); Kattan, *Knocking on* Wood: *Some Thoughts on the Immunities of State Officials to Civil Rights Damage Actions*, 30 Vand.L.Rev. 941, 978–86 (1977); McManis, *Personal Liability of State Officials Under State and Federal Law*, 9 Ga.L.Rev. 821, 831–48 (1975); Note, *Civil Rights Suits Against State and Local Government Entities and Officials: Rights of Action, Immunities, and Federalism*, 53 S.Calif.L.Rev. 945, 1048–60 (1980). Observers often have argued for a clarification of the standard to enable parties—both plaintiffs and defendants—to understand better the role that the qualified immunity defense plays in challenges to actions by government officials. *See, e.g.*, Note, *Accountability for Government Misconduct: Limiting Qualified Immunity and the Good Faith Defense*, 49 Temp. L.Q.

938 (1976). Despite this unfortunate ambiguity, however, the "clearly established" test can be applied with relative ease to the present case, and it is apparent that plaintiffs' claimed right was not clearly established.

Plaintiffs argue that the right to "liberty," which they claim is the violated right here, was clearly established at the time of Governor Alexander's actions. It is certainly true that the right to liberty—the right not to be detained without legal authority—as a general principle of law, was clearly established and long extant when Governor Alexander ordered plaintiffs' continued incarceration. This Court believes, however, that the right in question must be identified with far more specificity in order to find liability under section 1983. It is not enough that plaintiffs assert that their general right to liberty was violated by Governor Alexander and that Governor Alexander should have known that he was violating that right. Plaintiffs must instead show that the *specific* right involved here was clearly established. In other words, plaintiffs must show that their right to be released from prison pursuant to the January 15, 1979, commutations was clearly established at the time that Governor Alexander blocked their release. Plaintiffs have not—and as this Court believes, cannot—show such to have been the case. It is beyond dispute that valid disagreement existed concerning whether plaintiffs were entitled to freedom under the January 15, 1979, commutations. This disagreement existed not only at the time Governor Alexander acted on January 17, 1979, but continued as well until the action of the Tennessee Supreme Court in May, 1979. To argue that plaintiffs' right to freedom was clearly established at any point before May, 1979, ignores reality.[10]

10. Plaintiffs argue that the decision of the Tennessee Court of Criminal Appeals and the subsequent denial of certiorari by the Tennessee Supreme Court demonstrate that plaintiffs' right to liberty as of January, 1979, was indisputable. While those judicial actions did establish that plaintiffs were entitled to be released from their incarceration in January, they have

no real impact on the issue of whether plaintiffs' constitutional right was clearly established as of January 17, 1979. First, the Tennessee decision concerned only the statutory and state constitutional power of Governor Blanton to issue and make effective the January 15 commutations. The decision did not

Several recent decisions support this Court's conclusion that plaintiffs must demonstrate with specificity the constitutional right claimed to have been violated. In *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), a state prisoner sought relief under section 1983 when prison officials interfered with his outgoing mail. The prisoner claimed that his first amendment rights had been violated. The Supreme Court denied the claim, finding the defendants entitled to qualified immunity because the specific right of a convicted prisoner to have his mail free from interference had never been explicitly recognized and was therefore not clearly established. Moreover, in *Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978), the Seventh Circuit rejected an effort by a prisoner to obtain damages under section 1983 for being forced to handle pork while working in the prison cafeteria. The prisoner, a Muslim, argued that having to handle pork violated his freedom of religion guaranteed by the first amendment. The court ruled that the specific right of a prisoner to refuse to handle foodstuffs forbidden by his religion was not clearly established and thus found

the defendant officials immune from liability. Finally, in *Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir. 1981), the Sixth Circuit recently held that prison officials were entitled to qualified immunity when a prisoner sued under section 1983 for being punished after refusing to shave off his beard. The prisoner claimed that he was required to wear a beard as a member of the Sunni Muslim religious sect and that having to shave violated his freedom of religion. The Sixth Circuit declared that at the time of the prisoner's punishment, the right of prisoners to wear beards on religious grounds was not clearly established. The court emphasized that a distinction exists between general constitutional principles and particularized constitutional rights for section 1983 purposes and that liability exists only when the specific right has been violated. *See also Hurley v. Ward*, 451 F.Supp. 930 (S.D. N.Y. 1978).

On the basis of these decisions, this Court concludes that plaintiffs' constitutional right was not clearly established at the time that Governor Alexander acted.[11] Plaintiffs have thus failed to prove that Gover-

address the constitutional rights of the prisoners involved.

Second, even if constitutional overtones can be read into the Appeals Court's decision, it still has no determinative effect on the issue here. An official has no duty to anticipate unforeseeable constitutional developments. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978). Indeed, to find liability for damages for an action simply because it is subsequently found to have been violative of an individual's constitutional rights would unfairly impose upon administrators the burden of mistakes made in good faith in the course of exercising discretion within the scope of official duties. *Romeo v. Youngberg*, 644 F.2d 147, 171 (3d Cir. 1980), *cert. granted*, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981). As one court has stated,

> [C]ourts will not unfairly use hindsight in assessing official actions challenged in litigation. An officer is "entitled to rely on traditional sources" for the information on which he forms a belief as to the lawfulness of his act.... The official is protected if he entertains a reasonable belief that his actions are lawful, notwithstanding a subsequent judicial

determination that his actions have infringed constitutional rights.

*Apton v. Wilson*, 506 F.2d 83, 92 (D.C.Cir.1974) (citations omitted). *Cf. Little v. Walker*, 552 F.2d 193 (7th Cir. 1977); *McCormick v. Edwards*, 479 F.Supp. 295 (M.D.La.1979).

11. Needless to say, because plaintiffs' constitutional right was not clearly established, Governor Alexander's reasonableness in not believing that he was violating that right is beyond question. Although not necessary to the ruling in this case, this Court believes that Governor Alexander's actions throughout were eminently reasonable. Indeed, in light of the facts, this Court is hardpressed to think of a more appropriate case for granting qualified immunity to a defendant. Regarding the qualified immunity defense, one commentator has stated:

> The Supreme Court has marked out an objective standard of reasonableness in assessing the actions of executive officers under section 1983. This standard imposes upon them the obligation to pursue careful procedures in ascertaining facts and in educating themselves to the requirements of the law. It is not intended to drive responsible people from public service and should not have that effect. All that is required of the public servant is a rational effort to obtain the necessary

nor Alexander is not entitled to the protection of the qualified immunity defense. Accordingly, this Court rules that Governor Alexander is not liable under section 1983 for violating plaintiffs' constitutional rights. Plaintiffs' section 1983 action against Governor Alexander is dismissed.

## II. *Plaintiffs' Section 1985 Claim*

In addition to their section .1983 claim against all defendants individually, plaintiffs seek damages from defendants collectively under 42 U.S.C. § 1985(3). Section 1985(3) provides in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so ... deprived may have an action for damages, occasioned by such ... deprivation, against any one or more of the conspirators.

In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court enumerated the elements of a cause of action under section 1985(3). In order to come within the coverage of that provision at all, a plaintiff must allege that the defendants did (1) conspire (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. If a plaintiff meets these threshold requirements, he must then also prove that one or more of the conspirators (3) did or caused to be done an act in furtherance of the conspiracy, whereby the plaintiff was (4) deprived of having and exercising any right or privilege of a citizen of the United States. Upon review of the facts of this case, this Court concludes that plaintiffs here have failed to prove even the first element of the *Griffin* test. Plaintiffs have not demonstrated that any conspiracy existed in fact among defendants.

As noted in the discussion concerning plaintiffs' section 1983 claims, neither defendant Bradley nor defendant Dickman took part in the decision to prevent plaintiffs' release from prison. Moreover, neither defendant Bradley nor defendant Dickman could have brought about plaintiffs' release from prison had they attempted to do so. Although a conspiracy can certainly consist of decisions not to act as well as to act, this Court does not believe that the actions of defendants Bradley and Dickman in any way amounted to a conspiracy between either or both of them and defendant Governor Alexander. As related in the section 1983 discussion, Governor Alexander was the sole responsible actor among the defendants. A conspiracy requires more than one responsible party.[12]

Plaintiffs have thus failed to prove the existence of a conspiracy as is necessary under section 1985(3). Consequently, plaintiffs' section 1985 claim is dismissed against all defendants.

---

information and a rational assessment of that information before taking action.

McCormack & Kirkpatrick, *Immunities of State Officials Under Section 1983*, 8 Rut.-Cam. L.J. 65, 100 (1976). This Court echoes that evaluation and believes that Governor Alexander fits perfectly within its requirements.

12. Even if plaintiffs could somehow demonstrate that a conspiracy existed factually, this Court has severe doubts that the conspiracy would be recognized legally. Because all defendants are members of a single executive department, the legal existence of a conspiracy in this case likely is precluded by the intracorporate conspiracy doctrine. *See Herrmann v. Moore*, 576 F.2d 453 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Girard v. 94th Street & Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972); *Lieberman v. Gant*, 474 F.Supp. 848 (D.Conn. 1979). *Cf. Edmonds v. Dillin*, 485 F.Supp. 722 (N.D.Ohio 1980); *Rackin v. University of Pennsylvania*, 386 F.Supp. 992 (E.D.Pa. 1974). Moreover, even if a conspiracy were found to exist both factually and legally, defendants would be entitled to the same qualified immunity for their actions that precluded liability under section 1983. *See* this Court's discussion of the immunity defense, *supra*.