Melvin ALEXANDER, Plaintiff,

v.

Lamar ALEXANDER, et al., Defendants.

No. 79–3308.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 13, 1983.

**374**

Larry Woods, Nashville, Tenn., for plaintiff.

Robert R. Campbell, Knoxville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

This case is again before the Court on cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The Court previously granted summary judgment to defendant Alexander upon similar cross-motions. *Tate v. Alexander*, 527 F.Supp. 796 (1981). Upon appeal, this decision was affirmed in part, and vacated and remanded in part. *Alexander v. Alexander*, 706 F.2d 751 (6th Cir.1983).

Pursuant to the mandate of the Sixth Circuit, the questions now before this Court on summary judgment motions are:

1. Was the law clearly established at the time of plaintiffs' alleged injury?

2. If so, did the defendant, Governor Alexander, because of extraordinary circumstances, neither know, nor should he have known of the relevant legal standard? *Alexander, supra*, at 754.

The first question must be answered in the negative and, therefore, summary judgment in favor of the defendant, Governor Alexander, must be granted.

In making this determination, the Court has considered the depositions, stipulations, and the entire record in the cause and has cast the burden of proof upon defendant, as required by the Sixth Circuit order of remand. Although perhaps unnecessary to a determination of the clear establishment of the law at the time of the decisions by the defendant Governor, it is nonetheless important that these cases be understood in appreciation of the unique circumstances extant at the time of Governor Alexander's decisions.

It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

For months prior to January 1979, pardons and paroles in Tennessee had been the subject of intense media coverage and public debate. In the gubernatorial campaign in the fall of 1978, abuse of the pardon and parole power by then-Governor Blanton was made an issue by the successful candidate, Governor Alexander. (Alexander deposition, at 18). The Governor's office had been the target of investigation by the F.B.I., and indictments had been returned by a federal grand jury against the Governor's legal counsel, and two other members of his staff for selling "clemency for cash."[1] A trial involving the firing of the former chairman of the Parole Board had received great notoriety.[2] The bi-partisan concern over the previous abuse, and probable impending further abuse, of the pardon and parole power by Governor Blanton is most poignantly illustrated by the following facts: a Democrat U.S. Attorney recommended to a Democrat Attorney General of Tennessee, who in turn recommended to a Democrat Speaker of the Senate and a Democrat Speaker of the House that the sitting Democrat Governor be *deprived of his potential for abuse* by the three-day-early swearing-in of a *Republican* Governor. This was done! The U.S. Attorney had reliable information that Governor Blanton had issued, or was about to issue, commutations to some persons who were the subject of F.B.I. investigations into cash payments for clemency, and this information was conveyed to the Attorney General, the Speakers, and the Governor-elect. (Deposition of Leech, at 12–13). Attorney General Leech advised the early swearing-in, (Deposition of Leech, at 16) and advised "the first thing that should be done is that

1. *See United States v. Sisk*, No. 79–30054 (M.D. Tenn. March 15, 1979) (date of indictment).

2. P. Maas, Marie, A True Story (1983).

the prison doors should be closed...." (Deposition of Leech, at 17). General Leech instructed Assistant Attorney General Koch to tell Commissioner of Corrections Henderson to hold them (the commutations) at Central Records. (Deposition of Leech, at 18).[3]

With this historical context, the Court now turns to a consideration of the "clearly established" character of the law.[4]

1. State Attorney General Leech had been researching the question in his office as the result of other pending litigation when Governor Alexander was sworn in. (Leech deposition, at 30). On the basis of this research there appeared to be no Tennessee cases in point on when a commutation became effective. His office had discovered New York cases which required delivery to the inmate. Leech advised the Governor he was on "sound footing."

And our conclusion and our opinion was that the act of grace in granting a pardon is not complete until it has been consummated; and our reason for that was—is that every case that we saw, reported in the United States, held that. We saw none to the contrary, ...

(Leech deposition, at 35).

2. Mr. Fred Thompson, an attorney of national reputation,[5] was employed by Governor Alexander to be his Special Counsel in criminal justice matters beginning the night of his early swearing-in. Mr. Thompson conferred with General Leech, Assistant Attorneys General Cooney and Koch and concurred in their opinion.

Basically, it was that, with regard to those prisoners, for which commutations had been signed but had not been delivered, that the Governor would be within his legal rights to refuse to release those prisoners.

(Thompson deposition, at 9).

He then gave his opinion to the Governor:

... my opinion, based on what I was able to determine, was that delivery had to be delivery to the prisoner or to the prisoner's representative, possibly, at the outside, to the warden of the prison, where the prisoner was located; that, for delivery to be effectuated, delivery would have to be made to one of those individuals.

(Thompson deposition, at 13.)

3. Judge Thomas Hull, former Circuit Judge and Counsel to the Governor, concurred in this advice. (Hull deposition, at 38).

4. Assistant Attorney General Koch did independent legal research after receiving the memorandum of Assistant Attorney General Grunow. He concurred in the opinion of General Grunow that a delivery was necessary for a commutation to become effective. (Koch deposition, at 19–

(Leech deposition at 19–20).

---

3. The following excerpt from Leech's deposition is illuminating as to the urgency of the situation, the good faith of the actors, and their state of mind:

Right. It just didn't make any sense for me to do anything else, if the reason—if the compelling interest of the state was, under all of the information that we had, that a large number of people were going to be released at the last minute, some of whom were under investigation, under a federal investigation, for clemency for money, that the first thing we should do is—is to find out how many of them— whether or not they were actually issued, whether they were legally issued, and the— and the extent of the problem, since he was the Governor and he would be—the Governor who had taken the oath had the responsibility of operating the pen. There seemed—it just seemed to be no other—the only thing to do under the circumstances.

4. Much of this analysis would also be pertinent to a consideration of the second prong of the *Harlow* test (*Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), if that were reached. The advice of the State Attorney General, two assistants, Special Counsel Fred Thompson, and counsel to the Governor, Tom Hull, all was that the Governor was on firm legal grounds in taking the position he took. If necessary to the decision, this Court would hold that such advice from such an array of qualified lawyers would certainly constitute good faith, and that he neither "knew nor should have known" that his action was illegal.

5. Mr. Thompson was Minority Counsel to the Senate during the Watergate hearings.

22). (Opinion of Grunow, Exhibit 1 to Deposition of Hull).

5. The Tennessee Court of Criminal Appeals held the "delivery" insistence of the Attorney General and the Governor to be without merit. It did so, however, without citing a single case as precedent for its opinion. *Smith v. Thompson*, 584 S.W.2d 253 (Tenn.Cr.App.1979).

6. This Court has conducted its own research into the state of the law as it existed in January-April 1979, and not only were there no Tennessee precedents on the issue, all of the reported cases from other states sustained the position taken and advice given by the Attorney General.

From a consideration of all of the above, defendant Alexander has not only carried the burden on this issue, there is *no proof whatever* to the contrary. The law was not "clearly established" that Governor Alexander's actions were illegal. His actions were taken in eminent good faith, with very understandable and laudable motivations.

Plaintiff urges that after the Court of Criminal Appeals ruled on April 10, 1979, and while the petition for certiorari to the Tennessee Supreme Court was pending up until May 29, 1979, the law became established so as to render the exception to the rule applicable. Here again, defendant Governor Alexander acted upon the unanimous advice of the Attorney General of the State and his very competent independent legal advisors in retaining the plaintiff incarcerated pending action of the Supreme Court. As previously noted, the intermediate appellate opinion cited no authority for its holding. All the case law from sister states was contrary to its holding. There was good reason to believe that the Supreme Court would grant certiorari and reverse the appeals court. The law was not at that time "clearly established." The second prong of the *Harlow* test also applies in that there was good reason to believe that the relevant legal standard was not established, both in the good faith reliance on advice of competent counsel, and the fact that the appeals court decision was contrary to all reported opinions from other states.

Plaintiff urges upon the Court that line of cases establishing a right to procedural due process before a liberty interest may be deprived. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In this respect, plaintiff analogizes to the revocation of probation and insists that plaintiff had a right to procedural due process before his "undelivered" commutation could be revoked. *See Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). Plaintiff's reliance on these cases is misplaced. The fifth and fourteenth amendments guarantee due process before a property or liberty interest is taken. If there is no such interest to be taken, no process is required. The threshold question at issue before the Governor, his advisors, and the Tennessee Courts was whether or not there was a liberty interest, not whether one was being taken or by what process. If there was no delivery so as to be a completed commutation, plaintiff had no right to liberty. He was a convicted murderer, with all appeals exhausted, and facing a long term of lawfully deprived liberty. The commutation, if effected, was a matter of grace, not of right. His liberty interest, if any was inchoate until it was determined to be validly extant. As soon as it was finally determined by the Supreme Court of Tennessee that his term of imprisonment had been validly commuted, his liberty interest established, he was promptly released.

For all of the foregoing reasons, the summary judgment motion of defendant is granted and this suit dismissed with prejudice.

■ The Court also has before it the motion of plaintiff for attorney's fees under 42 U.S.C. § 1988. Plaintiff insists that because the Sixth Circuit reversed this court in part and remanded for further consideration, plaintiff should be considered to have "prevailed." As previously noted, the Sixth Circuit remand was for reconsideration of this Court's previous grant of summary judgment in light of the

panel's interpretation of *Harlow*'s casting of the burden of proof. Where the burden of proof lies in this case made no difference in the consideration of the original opinion or in this decision. There was not then, nor is there now, *any* evidence of a "clearly established" law governing the action of Governor Alexander, nor one about which he should reasonably have known. There was not then, nor is there now, *any* evidence of bad faith or malice on the part of defendants. In no sense of the word, can plaintiff be considered to have "prevailed" at any stage of this proceeding. The application for attorney's fees is denied.